IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KELLY J. MELLON and CYNTHIA L. MELLON, husband and wife, | ) ) ) | No. 31570-3-III |
| Appellants, | ) ) ) | |
| v. | ) ) | |
| | ) | PUBLISHED OPINION |
| REGIONAL TRUSTEE SERVICES CORPORATION, Trustee; INDYMAC MORTGAGE SERVICES, A DIVISION OF ONE WEST BANK, FSB; and ONE WEST BANK, FSB, | ) ) ) ) ) ) | |
| Respondents. | ) ) | |

BROWN, A.C.J.—Kelly J. and Cynthia L. Mellon appeal the CR 12(b)(6) dismissal

of their suit against IndyMac Mortgage Services and its parent organization, OneWest

Bank FSB (collectively IndyMac), for alleged wrongful conduct surrounding a

forbearance agreement on a defaulted note and deed of trust. The trial court concluded

federal regulation preempted state laws implicated in the Mellons' claims, and

regardless, those state laws did not support the Mellons' claims. The Mellons contend

the trial court erred in both conclusions and by failing to expressly decide their various

motions and releasing their injunction bond to IndyMac. We conclude the Mellons' state

consumer protection claim is not federally preempted and that part of the CR 12(b)(6)

dismissal was error. We affirm the remaining rulings, finding no error regarding the

various motions or injunction bond. Accordingly, we affirm in part, reverse in part, and

remand for further proceedings.

## FACTS

On October 25, 2007, the Mellons borrowed $188,000 from IndyMac to buy

residential real property. The Mellons signed a promissory note, payable in monthly

installments of $1,523.89, and secured by a deed of trust benefitting IndyMac.

OneWest bought the loan in March 2009 as IndyMac transitioned from the role of lender

to loan servicer. OneWest and IndyMac were federally chartered savings associations

during each relevant transaction.

Due to unemployment-related financial difficulties beginning in May 2010, the

Mellons made no loan payments between August 2010 and January 2011. IndyMac

offered the Mellons three new payment options. On February 21, 2011, Mr. Mellon

signed a forbearance agreement promising to pay $10,004.89 in February 2011 and

$2,951.20 monthly from March to July 2011. IndyMac reserved the right to terminate

the forbearance agreement and foreclose the deed of trust if the Mellons defaulted

again. The Mellons made the first payment on time, made the second payment late,

and did not make the third payment at all. On April 1, 2011, IndyMac returned the

Mellons' untimely check and terminated the forbearance agreement. IndyMac then

initiated foreclosure.

On May 5, 2011, the Mellons sued IndyMac under the deeds of trust act, chapter 61.24 RCW; the Foreclosure Fairness Act (FFA), Laws of 2011, chapter 58; the mortgage loan servicing act, chapter 19.148 RCW; and the Consumer Protection Act (CPA), chapter 19.86 RCW. The Mellons' alleged IndyMac "solicited . . . a compromise of the default, which was impossible of performance" and "unreasonable and impossible to perform" considering Mr. Mellons' unemployment status. Clerk's Papers (CP) at 6, 7. The Mellons further alleged IndyMac "failed to act in good faith and ha[d] a financial gain not to cooperate and to foreclose the [deed of trust] as a foreclosure would produce a higher financial gain." CP at 6.

Based on these factual allegations, the Mellons sought six forms of relief. First, the Mellons sought to either reinstate the defaulted note and deed of trust or fix an equitable payment of $1,582.89 monthly while requiring IndyMac to deal with them in good faith. Second, they sought to specifically compel IndyMac to deal with them in good faith by either removing their loan from default status or reducing their payments to $1,582.89 monthly. Third, the Mellons sought a ruling that they timely made the first and second payments under the forbearance agreement and may tender the third payment to the court clerk. Fourth, they sought to temporarily and permanently enjoin IndyMac from foreclosing the deed of trust. Fifth, the Mellons sought treble damages and attorney fees for IndyMac's unfair or deceptive act or practice. Finally, they sought attorney fees for IndyMac's nondisclosure regarding the loan transfer.

About two weeks later, the trial court temporarily enjoined the trustee's sale scheduled for May 27, 2011, on condition that every month until trial, the Mellons pay to

3

the court clerk the $1,523.80 in principal, interest, and reserves due under the note. The Mellons consistently made these payments over the next 12 months, raising the value of the injunction bond to $18,300.00.

The Mellons moved to fix the total loan amount, fix the unpaid loan balance, and reinstate the note and deed of trust. IndyMac moved to dismiss the Mellons' complaint with prejudice under CR 12(b)(6). The Mellons orally opposed IndyMac's motion in a manner sufficient to preserve the appeal issues. *See* RAP 2.5(a). In October 2012, the trial court implicitly denied the Mellons' motions by granting IndyMac's motion. The court concluded federal regulation preempted state laws implicated in the Mellons' claims, and regardless, those state laws did not support the Mellons' claims. The Mellons moved for reconsideration.

On January 30, 2013, after a two-month medical absence, the trial judge issued an order denying reconsideration and releasing the injunction bond to IndyMac. The Mellons were not notified of the ruling and, consequently, did not appeal in time. Once the Mellons discovered the ruling on March 8, 2013, they moved to vacate it for lack of service. The trial court denied the Mellons' motion and instead extended the time for them to appeal on March 25, 2013. The Mellons appealed two weeks later.

ANALYSIS

A. Extending Time to Appeal

The parties aptly observe: (1) the trial court erred by extending the time for the Mellons to appeal because it lacked authority to waive RAP 5.2(a) and (e); and (2) the Mellons improperly filed an untimely appeal without requesting relief from this court

4

under RAP 18.8(a) and (b). *See State v. Pilon*, 23 Wn. App. 609, 612, 596 P.2d 664 (1979). We accept this appeal because "extraordinary circumstances"—namely the trial court's failure to serve the Mellons the order denying reconsideration and releasing the injunction bond to IndyMac—"prevent[ed] the filing of a timely document." RAP 18.8 cmt., 86 Wn.2d 1271 (1976). Thus, "to prevent a gross miscarriage of justice," we extend the time for the Mellons to appeal under RAP 18.8(a) and (b) and adopt the trial court's time extension ruling nunc pro tunc.

## B. CR 12(b)(6) Dismissal

The issue is whether the trial court erred in dismissing the Mellons' complaint under CR 12(b)(6). The court based the CR 12(b)(6) dismissal on alternative grounds: (1) federal regulation preempted state laws implicated in the Mellons' claims; and (2) those state laws did not support the Mellons' claims. While the Mellons assigned error to both grounds, they abandoned their challenge to the second ground as it concerns their non-CPA claims. *See Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991) (an appellate court will not consider an error claim a party fails to support with legal argument in his or her opening brief); *see also Fosbre v. State*, 70 Wn.2d 578, 583, 424 P.2d 901 (1967); RAP 10.3(a)(6). The Mellons essentially concede the law does not support their non-CPA claims. Therefore, we affirm the CR 12(b)(6) dismissal except as it concerns the Mellons' CPA claim.

The Mellons contend they stated a CPA claim under the FFA and neither state statute is federally preempted. We review CR 12(b)(6) dismissals de novo. *Hoffer v.*

*State*, 110 Wn.2d 415, 421, 755 P.2d 781 (1988). And, we review preemption issues de novo. *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 100, 233 P.3d 861 (2010).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." CR 8(a)(1). Otherwise, a trial court may dismiss the complaint on motion for "failure to state a claim upon which relief can be granted." CR 12(b)(6). Dismissal is appropriate if, accepting all factual allegations as true, "it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief." *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 961, 577 P.2d 580 (1978); *see Barnum v. State*, 72 Wn.2d 928, 929-30, 435 P.2d 678 (1967). Dismissal is not appropriate if the complaint conceivably alleges some hypothetical situation, including facts argued for the first time on appeal, that if proved would be legally sufficient to justify relief for the plaintiff. *Halvorson v. Dahl*, 89 Wn.2d 673, 674-75, 574 P.2d 1190 (1978); *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995).

We begin with the trial court's conclusion that the Mellons did not state a cognizable CPA claim. The Mellons' complaint alleged IndyMac violated the CPA by proposing a bad faith forbearance agreement that was unreasonable and impossible to perform. To prevail in a private CPA claim, a plaintiff must prove: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531

6

(1986); *see* RCW 19.86.020, .090. We focus on the first CPA element because the Mellons sufficiently alleged the other four elements.

A plaintiff may predicate the first CPA element on "a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013) (clarifying *Hangman Ridge*, 105 Wn.2d at 785-86). A defendant's act or practice is per se unfair or deceptive if the plaintiff shows it violates a statute declaring the conduct to be an unfair or deceptive act or practice in trade or commerce. *See Hangman Ridge*, 105 Wn.2d at 786. To state a claim for a per se CPA violation, the plaintiff must allege "'the existence of a pertinent statute'" and "'its violation.'" *Fid. Mort. Corp. v. Seattle Times Co.*, 131 Wn. App. 462, 471, 128 P.3d 621 (2005) (quoting *Keyes v. Bollinger*, 31 Wn. App. 286, 290, 640 P.2d 1077 (1982)); *see Dempsey v. Joe Pignataro Chevrolet, Inc.*, 22 Wn. App. 384, 393, 589 P.2d 1265 (1979). The Mellons have not done so here.

At the time the Mellons sued, FFA section 14 declared it an unfair or deceptive act or practice in trade or commerce for an entity to violate its duty to mediate a deed of trust foreclosure in good faith under former RCW 61.24.163(8) (2011), to fail to comply with notice requirements under former RCW 61.24.031 (2011), or to violate its duty to initiate contact and exercise due diligence under former RCW 61.24.174 (2011). *See* RCW 61.24.135(2). But FFA section 14 took effect on July 22, 2011, more than two months after the Mellons sued and five months after Mr. Mellon signed the forbearance agreement. LAWS OF 2011, at ii; RCW 61.24.172 note; FINAL B. REP. on Second

7

Substitute H.B. 1362, at 4, 62d Leg., Reg. Sess. (Wash. 2011). Because this provision is not retroactive, it does not govern here.[1] And, proposing a forbearance agreement that is unreasonable and impossible to perform does not fall squarely within the conduct prohibited by FFA section 14. Thus, IndyMac's act or practice is not per se unfair or deceptive.

If a defendant's act or practice is not per se unfair or deceptive, the plaintiff must show the conduct is "unfair" or "deceptive" under a case-specific analysis of those terms. *See Klem*, 176 Wn.2d at 785-87. Because the CPA does not define those terms, their meaning evolves through a "'gradual process of judicial inclusion and exclusion.'" *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 275, 501 P.2d 290 (1972) (quoting *Fed. Trade Comm'n v. Raladam Co.*, 283 U.S. 643, 648, 51 S. Ct. 587, 75 L. Ed. 1324 (1931)), *modified by Hangman Ridge*, 105 Wn.2d. at 786; *see Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 349 (1989). We focus on unfairness because the Mellons allege no facts supporting deceptiveness.[2]

---

[1] Our legislature did not explicitly provide for FFA section 14 to apply retroactively and it is neither curative nor remedial where it creates a right of action for new per se CPA violations. *See Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 223, 173 P.3d 885 (2007); *State v. T.K.*, 139 Wn.2d 320, 332, 987 P.2d 63 (1999); *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 460-63, 832 P.2d 1303 (1992); *Johnston v. Beneficial Mgmt. Corp. of Am.*, 85 Wn.2d 637, 642, 538 P.2d 510 (1975).

[2] A defendant's act or practice is "deceptive" if it "has a capacity to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785; *see Fisher v. World-Wide Trophy Outfitters, Ltd.*, 15 Wn. App. 742, 748, 551 P.2d 1398 (1976). But a defendant's act or practice is not "deceptive" unless it involves "'a representation, omission or practice that is likely to mislead' a reasonable consumer." *Panang v. Farmers Ins. Co.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (quoting *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)). In their briefing to this court, the Mellons argue IndyMac engaged in a "deceptive practice" by "bundling . . . attorneys' fees and inspection fees into 'loan-related fees and services' totaling

We must liberally construe the CPA to serve its beneficial purposes and may look to federal law for guidance in doing so. RCW 19.86.920. Our Supreme Court has suggested a defendant's act or practice might be "unfair" if it "'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits.'" *Klem*, 176 Wn.2d at 787 (quoting 15 U.S.C. § 45(n)). Similarly, a defendant's act or practice might be "unfair" if it "offends public policy as established 'by statutes [or] the common law,' or is 'unethical, oppressive, or unscrupulous,' among other things." *Id.* at 786 (alteration in original) (quoting *Magney v. Lincoln Mut. Sav. Bank*, 34 Wn. App. 45, 57, 659 P.2d 537 (1983)); *see Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972) (quoting Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964)). For example, advancing a substantively or procedurally unconscionable contract term is likely an "unfair" act or practice. *See State v. Kaiser*, 161 Wn. App. 705, 722, 254 P.3d 850 (2011) (citing *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 309, 553 P.2d 423 (1976)).

Asserting bad faith, the Mellons argue that because IndyMac knew Mr. Mellon was unemployed when he signed the forbearance agreement, it was "unconscionable" for IndyMac to propose "higher payments than those originally defaulted upon, plus a balloon payment of over $10,000." Appellants' Opening Br. at 18. The question

---

$53,295.46." Appellants' Opening Br. at 19. But this alleged bundling occurred after the Mellons sued and cannot serve as a post hoc factual basis for their earlier claim of deceptiveness.

becomes whether IndyMac, by proposing a bad faith forbearance agreement that was unreasonable and impossible to perform, advanced a substantively or procedurally unconscionable contract term in a manner amounting to an "unfair" act or practice. This is a summary judgment or trial question, not a CR 12(b)(6) question.[3] We hold this hypothetical situation, if proved, would justify CPA relief for the Mellons. Therefore, the trial court erroneously concluded the Mellons did not state a cognizable CPA claim.

Next, we turn to the trial court's conclusion that federal regulation preempts state laws implicated in the Mellons' CPA claim. Under the preemption doctrine, a federal statute trumps state laws if the U.S. Congress expressly or impliedly intended that result, commanding it explicitly in the statutory language or implicitly in the statutory structure and purpose.[4] *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141,

---

[3] Regarding unconscionability, our Supreme Court has instructed: Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh. Shocking to the conscience, monstrously harsh, and exceedingly calloused are terms sometimes used to define substantive unconscionability. Procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print. . . . [T]hese three factors should not be applied mechanically without regard to whether in truth a meaningful choice existed.

*Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 303, 103 P.3d 753 (2004) (citations omitted) (internal quotation marks omitted) (alterations omitted); *accord Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344-45, 103 P.3d 773 (2004).

[4] The preemption doctrine derives from the Supremacy Clause, which provides, "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . , shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

10

152-53, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982) (quoting *Jones v. Rath Packing Co.*,

430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977)); *Silvas v. E\*Trade Mortg.*

*Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008); *Bank of Am. v. City of S.F.*, 309 F.3d 551,

557-58 (9th Cir. 2002). A federal administrative rule has no less preemptive effect than

a federal statute if the agency acted within its statutory mandate in promulgating the

rule. *de la Cuesta*, 458 U.S. at 153-54 (citing *United States v. Shimer*, 367 U.S. 374,

381-83, 81 S. Ct. 1554, 6 L. Ed. 2d 908 (1961)); *Silvas*, 514 F.3d at 1005; *Bank of Am.*,

309 F.3d at 560.

We may infer preemptive intent where federal regulation is so pervasive as to

occupy the entire field on a subject matter, leaving no room for supplemental state

laws—a phenomenon called field preemption.[5] *de la Cuesta*, 458 U.S. at 153 (quoting

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447

(1947)); *Silvas*, 514 F.3d at 1004; *Bank of Am.*, 309 F.3d at 558, 560. Because

Congress has heavily regulated the banking field for almost 200 years, the usual

presumption against preemption does not apply here. *See Silvas*, 514 F.3d at 1004-05;

*Bank of Am.*, 309 F.3d at 558-59.

Congress enacted the Home Owners' Loan Act of 1933 (HOLA), Pub. L. No. 73-

43, 48 Stat. 128, during the Great Depression, when loan default was rampant and

---

[5] Alternatively, we may infer preemptive intent where state laws actually conflict with federal regulation, making simultaneous compliance physically impossible or interposing an obstacle to discernable federal objectives—a phenomenon called conflict preemption. *de la Cuesta*, 458 U.S. at 153 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)); *Silvas*, 514 F.3d at

credit was scarce. *de la Cuesta*, 458 U.S. at 159-60. HOLA tried to ameliorate these circumstances with "'a radical and comprehensive response to the inadequacies of the existing state systems.'" *Id.* at 160 (quoting *Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1257 (9th Cir. 1979), *aff'd mem.*, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (1980)). Later HOLA amendments delegated to the Office of Thrift Supervision (OTS) broad rulemaking authority over the lending operations of federal savings associations. *Compare* HOLA §§ 4(a), 5(a), 48 Stat. at 129, 132 (delegating rulemaking authority to an OTS predecessor, the Federal Home Loan Bank Board), *and de la Cuesta*, 458 U.S. at 145, 161-66 (discussing the breadth of the Board's rulemaking authority), *with* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, sec. 301, §§ 4(a), 5(a), 103 Stat. 183, 280, 282 (transferring the Board's rulemaking authority to the OTS).

Acting within its statutory mandate, the OTS promulgated an administrative rule establishing HOLA preemption by declaring "OTS hereby occupies the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). "Accordingly," the OTS confirmed, "federal savings associations may extend credit as authorized under federal law, . . . without regard to state laws purporting to regulate or otherwise affect their credit activities." *Id.* The OTS listed illustrative examples of preempted state laws, such as laws imposing new requirements on a federal savings association's "terms of credit," "[l]oan-related fees," "[d]isclosure," and loan "servicing." *Id.* § 560.2(b)(4)-(5), (9)-(10). The OTS clarified it does not intend to preempt state laws

---

1004; *Bank of Am.*, 309 F.3d at 558. We focus on field preemption because the parties

concerning real property, contracts, and torts, among other topics, if those laws "only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." *Id.* § 560.2(c)(1)-(2), (4).

The OTS explained how we should apply HOLA preemption standards:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

Lending and Investment, 61 Fed. Reg. 50,951, 50,966-67 (Sept. 30, 1996). The OTS's interpretation of its own administrative rule controls our analysis. *See Silvas*, 514 F.3d at 1005 n.1 (citing *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997)); *see also Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413-14, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945). *But see McCurry*, 169 Wn.2d at 105 (apparently disregarding this rigid analytical framework to reach "the dispositive issue [of] whether the generally applicable state law more than incidentally affects [lending]").

Congress diminished HOLA preemption in enacting the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 25b, 1465. An OTS successor, the Office of the Comptroller of the Currency (OCC), soon promulgated an administrative

---

do not discuss conflict preemption.

rule implementing Dodd-Frank preemption.[6] 12 C.F.R. § 150.136. These statutes and this administrative rule took effect on July 21, 2011. 12 U.S.C. §§ 5481(9), 5551 note, 5582; Office of Thrift Supervision Integration Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 76 Fed. Reg. 48,950, 48,953 (Aug. 9, 2011); Designated Transfer Date, 75 Fed. Reg. 57,252, 57,252-53 (Sept. 20, 2010). After taking effect, those provisions "shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the [OCC] or the [OTS] regarding the applicability of State law under Federal banking law to any contract entered into on or before July 21, 2010." 12 U.S.C. § 5553.

Mr. Mellon signed the forbearance agreement five months before Dodd-Frank preemption standards took effect on July 21, 2011. Because those provisions are not retroactive, HOLA preemption standards govern here.[7] *See McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 554 n.2 (4th Cir. 2013); *Molosky v. Wash. Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011); *In re Frykberg*, 490 B.R. 652, 658 n.6 (B.A.P. 1st Cir. 2013); *Henning v. Wachovia Mortg., FSB*, ___ F. Supp. 2d ___, 2013 WL 5229837, at *5 & n.7 (D. Mass. 2013); *Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 167 n.5 (D.D.C. 2011). In relating HOLA preemption standards to the Mellons' complaint, we must consider what "functional effect" their suit would have on IndyMac's lending

---

[6] Dodd-Frank transferred the OTS's functions to the OCC on July 21, 2011 and abolished the OTS on October 19, 2011. 12 U.S.C. §§ 5411, 5412, 5413.

[7] The loan origination date does not fully determine what law applies because the forbearance agreement is a separate "contract" from the note and deed of trust. 12 U.S.C. § 5553. *See generally Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 388 (7th Cir. 1998) (explaining, in a different setting, that a forbearance agreement is distinct

operations, noting any "new requirements" imposed. *Plastino v. Wells Fargo Bank*, 873 F. Supp. 2d 1179, 1185 (N.D. Cal. 2012); *Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 972 (N.D. Cal. 2010). This approach evaluates state laws solely "as applied" to IndyMac by the Mellons' complaint. *Silvas*, 514 F.3d at 1006, 1008; *In re Menjivar*, No. CC-12-1608-KuBaPa, 2014 WL 308912, at *6 (B.A.P. 9th Cir. Jan. 28, 2014).

The Mellons do not complain IndyMac violated generally applicable state foreclosure laws in exercising its rights under the forbearance agreement. And, they do not allege IndyMac breached any contract or fraudulently misrepresented facts concerning any contract. *Cf. McCurry*, 169 Wn.2d at 104-05, 109. Instead, they complain IndyMac played hardball in negotiating the forbearance agreement, lamenting their lack of bargaining power and inability to demand a better deal.

A forbearance agreement is basically a temporary loan modification. *See generally* RCW 19.146.010(20) (including a forbearance agreement or renegotiated payment plan in the definition of a mortgage loan modification); RCW 31.04.015(22) (same); RCW 61.24.050(2)(a)(ii) (equating a forbearance plan or loan modification with a deed of trust loss mitigation agreement); *Albice v. Premier Mortg. Servs. of Wash., Inc.*, 174 Wn.2d 560, 571, 276 P.3d 1277 (2012) (similar). Many courts have concluded, in a context unrelated to HOLA preemption standards, that negotiating a loan modification is a "traditional money lending activity" intimately connected to a lender's role because the process mirrors negotiations preceding loan origination. *E.g.*,

from and temporarily displaces a defaulted note by establishing a renegotiated payment

*Flores v. EMC Mortg. Co.*, ___ F. Supp. 2d ___, 2014 WL 641097, at *16 (E.D. Cal. 2014); *Khan v. CitiMortgage, Inc.*, ___ F. Supp. 2d ___, 2013 WL 5486777, at *14 (E.D. Cal. 2013); *Rockridge Trust v. Wells Fargo, N.A.*, ___ F. Supp. 2d ___, 2013 WL 5428722, at *35-36 (N.D. Cal. 2013); *Casault v. Fed. Nat'l Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1130-31 (C.D. Cal. 2012).

Still, the Mellons' suit would not have the functional effect of imposing new requirements on IndyMac's lending operations. The Mellons' complaint alleged IndyMac violated the CPA by proposing a bad faith forbearance agreement that was unreasonable and impossible to perform, i.e., "unconscionable." Appellants' Opening Br. at 18. The Mellons then sought treble damages and attorney fees for IndyMac's unfair or deceptive act or practice. Generally applicable state contract law has long provided remedies to victims of substantively or procedurally unconscionable contract terms. *See, e.g., Ward v. Buckley*, 1 Wash. Terr. 279, 282 (1870); *Gandee v. LDL Freedom Enters., Inc.*, 176 Wn.2d 598, 603, 293 P.3d 1197 (2013). This contract law properly escapes HOLA preemption. *See* Lending and Investment, 61 Fed. Reg. at 50, 966 (stating 12 C.F.R. § 560.2 "preserve[s] the traditional infrastructure of basic state laws that undergird commercial transactions.").

This contract law, as applied in the Mellons' claim, might arguably impact a federal savings association's "terms of credit," "[l]oan-related fees," "[d]isclosure," or loan "servicing." 12 C.F.R. § 560.2(b)(4)-(5), (9)-(10). But "[a]ny effect this [contract law] has on [IndyMac's] lending operations is unintended, ancillary, and subordinate to

---

plan suspending a mortgage foreclosure).

the purpose of the contract law." *McCurry*, 169 Wn.2d at 108 (holding 12 C.F.R. § 560.2 did not preempt the CPA, to the extent it relied on generally applicable state contract law requiring adherence to contracts and prohibiting fraudulent misrepresentation of facts concerning contracts, because any impact this contract law has on a federal savings association's lending operations "is, by definition, incidental"). We hold this impact would "only incidentally affect [IndyMac's] lending operations." 12 C.F.R. § 560.2(c). Therefore, the trial court erroneously concluded federal regulation preempts state laws implicated in the Mellons' CPA. In summary, the trial court committed two errors in dismissing the Mellons' CPA claim under CR 12(b)(6).

### C. Undecided Motions

The issue is whether the trial court erred by failing to expressly decide the Mellons' motions to fix the total loan amount, fix the unpaid loan balance, and reinstate the defaulted note and deed of trust. The Mellons contend we should remand to resolve these motions.

By granting the CR 12(b)(6) dismissal, the trial court implicitly decided the Mellons' various motions against them because the law did not provide the remedies they sought. The court did not err in this determination. These motions concerned solely the Mellons' non-CPA claims. As discussed above, the Mellons essentially concede the law does not support their non-CPA claims. Given this backdrop, we conclude the trial court did not err by failing to expressly decide the Mellons' various motions.

17

## D. Bond Release

The issue is whether the trial court erred by releasing the injunction bond to IndyMac. The Mellons contend the court should have either returned the bond to them or instructed IndyMac to apply the bond solely to the loan principal.

The Mellons asked to temporarily enjoin the trustee's sale under RCW 61.24.130. As a condition to receiving this remedy, the Mellons had to "pay to the clerk of the court the sums that would be due on the obligation secured by the deed of trust if the deed of trust was not being foreclosed." RCW 61.24.130(1). Specifically, this injunction bond required the Mellons to tender "the periodic payment of principal, interest, and reserves paid to the clerk of the court every thirty days." RCW 61.24.130(1)(a). The bond exists to "protect good faith lenders." *Bowcutt v. Delta N. Star Corp.*, 95 Wn. App. 311, 321, 976 P.2d 643 (1999).

RCW 61.24.130 does not specify what the trial court must do when it concludes a trustee's sale party has been wrongfully enjoined. But the procedure is presumably the same as with CR 65(c) and RCW 7.40.080. Thus, the court could use the bond to compensate IndyMac for actual damages caused by the wrongful injunction. *See Swiss Baco Logging Co. v. Haliewicz*, 14 Wn. App. 343, 345, 541 P.2d 1014 (1975); *Knappett v. Locke*, 92 Wn.2d 643, 646-47, 600 P.2d 1257 (1979); 1 GRANT S. NELSON & DALE A. WHITMAN, REAL ESTATE FINANCE LAW § 7.22, at 690 (4th ed. 2002); Joseph L. Hoffman, Comment, *Court Actions Contesting the Nonjudicial Foreclosure of Deeds of Trust in Washington*, 59 WASH. L. REV. 323, 327-28, 333 (1984). The court released the bond to

IndyMac for that very purpose following a 20-month delay in the deed of trust foreclosure.

First, the Mellons unpersuasively argue the bond release effectuated a forfeiture, which equity abhors. *See* Stephen A. Spitz, *Forfeitures*, *in* 9 THOMPSON ON REAL PROPERTY § 77.01, at 86 (David A. Thomas ed., 3d. Thomas ed. 2011) (defining a "forfeiture" as the "'divestiture of property without compensation, in consequence of a default or an offense'" (quoting 36 AM. JUR. 2D *Forfeiture and Penalties* § 1 (1968))). The bond release functioned as compensation for IndyMac's actual losses rather than an automatic forfeiture based on the Mellons' loan default. *See* Dan B. Dobbs, *Should Security Be Required as a Pre-Condition to Provisional Injunctive Relief?*, 52 N.C. L. REV. 1091, 1093-94, 1122 (1974). Second, the Mellons unpersuasively argue the bond required additional restrictions on its use. Its use is already limited to the "principal, interest, and reserves" that would be due on the note but for the deed of trust foreclosure. RCW 61.24.130(1)(a). Accordingly, we conclude the trial court did not err by releasing the injunction bond to IndyMac.

## E. Attorney Fees and Costs

The parties seek appellate attorney fees and costs as the prevailing party under the deed of trust, RCW 4.84.330, and RAP 18.1(a). But considering our analysis, each party prevails on a major issue and loses on others. Thus, no party stands as the clear victor meriting such an award. *See Am. Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 234, 797 P.2d 477 (1990); *Tallman v. Durussel*, 44 Wn. App. 181, 189, 721 P.2d 985 (1986); *Oneal v. Colton Consol. Sch. Dist. No. 306*, 16 Wn. App. 488,

No. 31570-3-III
*Mellon v. Reg'l Tr. Servs. Corp.*

493, 557 P.2d 11 (1976). Additionally, the Mellons request an award of appellate attorney fees and costs under RCW 19.148.030(3). But we conclude the Mellons are not entitled to such an award because they alleged no injury or actual damages resulting from IndyMac's nondisclosure regarding the loan transfer. Therefore, we deny each party's request.

Affirmed in part. Reversed in part. Remanded for further proceedings.

Brown, A.C.J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey, J.

20