## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

        Respondent,

      v.

MONTLAKE LLC, a Washington
limited liability company; STELTER
MONTLAKE LLC, a Washington limited
liability company; BTF ENTERPRISES,
INC., a Washington corporation;
T-MOBILE USA, INC., MONTLAKE
COMMUNITY CLUB,

        Appellants,

SCOTT IVERSON & BTF
ENTERPRISES, INC. dba Montlake
Boulevard Market; HORST KIESSLING,
dba Hop in Christmas Trees; ANGELA
ROSE STERLING dba Montlake
Espresso; STC FIVE LLC, a Delaware
limited liability company; CROWN
CASTLE USA, INC., a Pennsylvania
corporation; GLOBAL SIGNAL
ACQUISITIONS III LLC, a Delaware
limited liability company; NEW
CINGULAR WIRELESS PCS, LLC, a
Delaware limited liability company;
SEATTLE SMSA LIMITED
PARTNERSHIP, a Delaware limited
partnership dba Verizon Wireless;
SPRINT SPECTRUM L.P., a Delaware
limited partnership; and KING
COUNTY,

        Defendants.

No. 77359-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 30, 2018

LEACH, J. — The Montlake Community Club (MCC) and the owners and lessees of three lots (Montlake) appeal the trial court's order of public use and necessity and two related orders. They challenge the adequacy of the project's environmental assessment, the necessity of taking these three lots, compliance with legislative direction, and the authority of the individual who selected these properties for taking. Because substantial evidence supports the trial court's factual findings and those findings support its legal conclusions, we affirm.

## FACTS

In 2006, the legislature provided the Washington State Department of Transportation (WSDOT) with directions for several "Mega-Projects," including the SR 520 Bridge Replacement and HOV[1] Program ("Project").[2] This Project involves the replacement of a floating bridge across Lake Washington spanning from Medina to Montlake. WSDOT divided the project into segments and named the final construction segment the Rest of the West. It extends from the Montlake area to I-5.

As the first step of a two-step process to construct the Rest of the West, WSDOT will build the Montlake Phase. This extends from the floating bridge

---

[1] High occupancy vehicle lane.

[2] RCW 47.01.380, .390, former .405. The legislature repealed former RCW 47.01.405 in 2017. LAWS OF 2017, 3d Spec. Sess., ch. 25 § 39. Former RCW 47.01.405 required the office of financial management to hire a mediator to develop an SR 520 project impact plan. It required the mediator to provide periodic reports to the joint transportation committee and the governor and submit a final project plan by December 1, 2008.

structure to the Montlake neighborhood. This case involves WSDOT's effort to condemn three lots located in a small commercial district at the southwest corner of Montlake Boulevard and SR 520: the Montlake 76 Gas Station with T-Mobile's wireless facility located on the roof, the Montlake Boulevard Market (Market), and a vacant parking lot ("Properties").

The Project requires that WSDOT work in cooperation with the Federal Highway Administration (FHWA). To comply with the National Environmental Policy Act (NEPA),[3] and the Washington State Environmental Policy Act (SEPA),[4] FHWA published the Final Environmental Impact Statement (FEIS) for the Project in June 2011. In August 2011, FHWA issued its Record of Decision (ROD) describing the Project's Selected Alternative.

During construction, WSDOT made design changes that differed from the Selected Alternative. These changes included WSDOT's decision to acquire, but not condemn, the Properties. Federal regulations interpreting NEPA require that an agency provide a supplemental environmental impact statement (EIS) whenever it makes changes that would result in "significant environmental impacts" not evaluated in the FEIS.[5]

In October 2016, FHWA and WSDOT prepared a Reevaluation incorporating the design changes. Because the Reevaluation concluded that

---

[3] 42 U.S.C. § 4321.
[4] Ch. 43.21C RCW.
[5] 23 C.F.R. § 771.130(a)(1).

No. 77359-3-I / 4

these changes would not result in significant environmental impacts not evaluated in the FEIS, WSDOT and FHWA did not issue a supplemental EIS. Neither Montlake nor MCC contests the sufficiency of any NEPA required document, including the Reevaluation.

On May 16, 2017, WSDOT filed a lawsuit seeking to condemn the Properties. On May 19, 2017, it filed a motion for an order adjudicating public use and necessity (PUN). In June 2017, Montlake asked for oral argument and live witness testimony with cross-examination at the hearing on WSDOT's PUN motion. In July 2017, the trial court granted MCC's request to intervene. After a hearing, the trial court granted WSDOT's PUN motion and entered two related orders addressing an environmental issue and the authority of the program administrator. Montlake and MCC appeal all three orders.

ANALYSIS

"The power of eminent domain is an inherent attribute of sovereignty."[6] Our state constitution limits this power and requires that a court decide if the contemplated use is really public.[7] The condemning authority bears the burden of proving public use and necessity.[8] It must prove (1) the use of the

---

[6] Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC, 159 Wn.2d 555, 565, 151 P.3d 176 (2007) (NAFTZI).
[7] Miller v. City of Tacoma, 61 Wn.2d 374, 382-83, 378, P.2d 464 (1963).
[8] NAFTZI, 159 Wn.2d at 566.

-4-

appropriated property is public, (2) the public interest requires this public use, and (3) condemning the property is necessary for the public interest.[9]

The need for the property does not have to be "absolute, or indispensable, or immediate" but must be "[r]easonabl[y] necess[ary] for use in a reasonable time."[10] "A declaration of necessity by a legislative body is 'conclusive'" unless the challenger meets its burden to show "'proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud.'"[11] "'To establish constructive fraud [the challenger] must show willful and unreasoned action without consideration and regard for facts or circumstances.'"[12]

Here, Montlake and MCC challenge the trial court's decision that condemnation of the Properties is reasonably necessary for the construction of the Project on four grounds:

1. The trial court and WSDOT did not adequately consider the environmental impacts of the Project;

2. Taking the Properties is not reasonably necessary to build the Project;

---

[9] HTK Mgmt., LLC v. Seattle Popular Monorail Auth., 155 Wn. 2d 612, 629, 121 P.3d 1166 (2005).

[10] City of Tacoma v. Welcker, 65 Wn.2d 677, 684, 399 P.2d 330 (1965).

[11] NAFTZI, 159 Wn.2d at 575-76 (quoting Seattle Popular Monorail Auth., 155 Wn.2d at 629).

[12] Cent. Puget Sound Reg'l Transit Auth. v. Miller, 156 Wn.2d 403, 437, 128 P.3d 588 (2006) (quoting In re Port of Seattle, 80 Wn.2d 392, 398, 495 P.2d 327 (1972)).

3. The Secretary of Transportation improperly delegated authority to select the Properties for condemnation; and

4. WSDOT did not satisfy the Mega-Project requirements established by RCW 47.01.380, RCW 47.01.390, and former RCW 47.01.405 (2007).

The legislature delegated to WSDOT the power to determine which limited access rights it needs to acquire, by condemnation or otherwise, to construct and maintain state highways.[13] WSDOT's determination of necessity is therefore conclusive unless Montlake or MCC proves that it was fraudulent or arbitrary and capricious amounting to constructive fraud.

The trial court upheld WSDOT's necessity determination and determined that its condemnation decision was not arbitrary and capricious to the point of constructive fraud. We review Montlake's and MCC's challenges to the trial court's findings to determine whether substantial evidence supports them.[14] We view substantial evidence in the light most favorable to the respondent.[15] "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise."[16] We accept unchallenged findings

---

[13] RCW 47.12.010.

[14] Petters v. Williamson & Assocs., Inc., 151 Wn. App. 154, 163, 210 P.3d 1048 (2009).

[15] NAFTZI, 159 Wn.2d at 576.

[16] Petters, 151 Wn. App. at 163.

of fact as true on appeal.[17] We review questions of law and the trial court's conclusions of law de novo.[18]

### The Trial Court Adequately Assessed the Environmental Impact of the Project

*A. WSDOT's Consideration of the Project's Environmental Impacts Does Not Show That Its Condemnation Decision Was Arbitrary and Capricious Amounting to Constructive Fraud*

Both Montlake and MCC claim that WSDOT did not give due consideration to the environmental impacts of the Properties' condemnation, making its condemnation determination arbitrary and capricious amounting to constructive fraud. They rely on State v. Brannan,[19] where our Supreme Court stated that whether the condemning authority gave "due consideration" to the environmental impacts of the project is "relevant" to whether it acted "fraudulently or so arbitrarily and capriciously as to amount to constructive fraud." Brannan explained that the condemning authority should view the impact on the environment "from the standpoint of the entire project and not on a segment-by-segment basis."[20] This inquiry is independent of whether the condemning authority satisfied its obligations under NEPA and SEPA.[21]

---

[17] The-Anh Nguyen v. City of Seattle, 179 Wn. App. 155, 163, 317 P.3d 518 (2014).
[18] Nguyen, 179 Wn. App. at 163, 172.
[19] 85 Wn.2d 64, 75, 530 P.2d 322 (1975).
[20] Brannan, 85 Wn.2d at 75.
[21] Brannan, 85 Wn.2d at 74-75 (explaining that even though the parties could not raise collaterally the sufficiency of the EIS in the current condemnation proceeding, the lower court could consider whether the condemning authority gave due consideration to the environmental effects of the project).

As a preliminary matter, Montlake and MCC claim that the NEPA Reevaluation standing alone does not show that WSDOT gave due consideration to the condemnation's environmental impacts. They note that although the Reevaluation concluded that the revised project plans would not cause significant adverse environmental impacts beyond those evaluated in the FEIS, it only considered closing the Gas Station and limiting access to the Market. The Reevaluation did not consider whether any additional environmental impacts caused by condemning the Market would require a supplemental EIS. When FHWA and WSDOT issued the Reevaluation, WSDOT had decided only to acquire the Properties as opposed to condemn them. Although the Reevaluation provides evidence that WSDOT considered the environmental impacts of the Project as a whole, it does not show that it considered the specific impacts of the Properties' condemnation.

MCC asserts that substantial evidence does not support the trial court's findings that WSDOT adequately considered the Project's environmental impacts, which support its conclusion that WSDOT's condemnation decision was not arbitrary and capricious amounting to constructive fraud. We disagree.

First, MCC claims that WSDOT failed to evaluate the transit-related impacts of the Market's closure. But WSDOT did consider how increased traffic congestion could affect community members' ability to access other markets.

Denise Cieri, deputy program administrator for the Project, testified that there are 58,000 daily trips on Montlake Boulevard. When asked if WSDOT considered that closing the Market might add up to 800 new vehicle trips per day on Montlake Boulevard, Cieri stated in her deposition, "I think it was recognized that if [Montlake] [M]arket weren't available for local people to access that there were other markets, such as Mont's a couple of blocks away, and other markets further than that that are in the vicinity of this neighborhood." Thus, WSDOT considered the issue. In addition, consistent with the State's position, 800 more vehicles would produce a 1.38 percent increase in traffic on Montlake Boulevard. The ROD states that only a traffic increase of 5 percent or more could result in measureable changes. WSDOT's failure to consider a nonmeasurable increase in congestion on Montlake Boulevard does not undermine the trial court's findings.

Second, MCC claims that substantial evidence does not support the trial court's finding that "WSDOT fully considered the adverse impacts to Montlake neighborhood residents upon closure of the Montlake Market, and balanced these impacts with the public's need to reduce traffic congestion through the SR 520 corridor." But, as the State claims, WSDOT did consider how the Market's closure would impact the community and, consistent with Brannan, extensively considered the environmental impacts of the Project as a whole.

Cieri testified about WSDOT's awareness of the community's strong opposition to its condemnation decision. She explained, "[R]ather than impact a historic neighborhood on the other side of the road, it makes more sense to have an additional impact to this property. Impacting a historic neighborhood would be extraordinarily difficult, as well as require quite a lot of environmental evaluation." WSDOT also balanced the desires of Montlake residents to keep their walking-distance market with the ability of the nonmotorized community to access more streamlined transportation facilities. WSDOT and counsel from the Office of the Attorney General reviewed the Properties' owners' objections to the condemnation before selecting the Properties for condemnation. Cieri also explained WSDOT's need to accommodate the 58,000 daily trips on Montlake Boulevard during construction.

Further, the Project as a whole has undergone significant environmental review. The federal district court upheld the adequacy of the over 1,000-page FEIS detailing the environmental impacts of the Project.[22] Cieri also testified about the Seattle design process in which WSDOT worked with the City and SR 520 neighborhoods to address City and community concerns. WSDOT's consideration of the environmental impacts of both condemning the Properties

---

[22] Coal. for a Sustainable 520 v. U.S. Dep't of Transp., 881 F. Supp. 2d 1243, 1258-59 (W.D. Wash. 2012) (court order) (upholding the validity of the FEIS and the ROD and rejecting challengers' claims that the FEIS did not adequately analyze the adverse environmental impacts or consider alternatives).

and of the entire project support the trial court's findings that WSDOT considered the adverse impacts to the Montlake neighborhood of the Market's closure and did not select the Properties in an arbitrary and capricious manner amounting to constructive fraud.

In addition to MCC's arguments, Montlake contends that WSDOT's condemnation decision was arbitrary and capricious because it ignored policies that it could have relied on to reduce the potential environmental impacts of the Project. First, it claims that WSDOT did not follow its Design-Build Guidebook. But unlike administrative rules and formally promulgated agency regulations, internal policies do not have the force of law unless they are the equivalent of liability-creating administrative rules.[23] Here, because WSDOT did not formulate its policies in the Guidebook in response to legislative delegation, these policies do not have the force of law.[24] WSDOT's failure to follow its Guidebook does not undermine the trial court's findings.

Second, Montlake claims that WSDOT ignored the Project's stated purposes in the ROD. The Project's purposes includes improved mobility for people and goods from Seattle to Redmond, cost efficiency, and minimized impacts on affected neighborhoods and the environment. Although WSDOT is

---

[23] Joyce v. Dep't of Corr., 155 Wn.2d 306, 323, 119 P.3d 825 (2005).

[24] Joyce, 155 Wn.2d at 323 (holding that "because the Department [of Corrections'] policy directives are not promulgated pursuant to legislative delegation, they do not have the force of law").

not required to satisfy every enumerated purpose in the ROD, the above discussion illustrates that WSDOT has acted consistently with the Project's stated purpose. Montlake does not show that WSDOT's condemnation decision was arbitrary and capricious because it allegedly ignored select policies.

*B. The Trial Court Correctly Found That SEPA Did Not Apply to the State's PUN Motion*

Montlake challenges the trial court's conclusion that SEPA did not apply to WSDOT's PUN motion. SEPA requires state agencies to include in every proposal for "major actions significantly affecting the quality of the environment, a detailed statement . . . on . . . the environmental impact of the proposed action [and] any adverse environmental effects which cannot be avoided" among other environmental-related factors.[25] But RCW 43.21C.135 allows an agency that prepares an "adequate detailed statement" that satisfies NEPA to use it in lieu of the EIS that SEPA requires and exempts the agency from satisfying SEPA's requirements.[26] This means that a project does not need a SEPA EIS when it has an EIS that satisfies NEPA. Because a federal district court upheld the validity of the FEIS under NEPA[27] and the sufficiency of the FEIS was not at

---

[25] RCW 43.21C.030(2)(c)(i), (ii).

[26] RCW 43.21C.150; Boss v. Dep't of Transp., 113 Wn. App. 543, 550, 54 P.3d 207 (2002); see also Coal. for a Sustainable 520, 881 F. Supp. 2d at 1260 ("Washington courts have held that an EIS which is sufficient to meet NEPA may also be used to satisfy SEPA requirements as long as notice provisions have been met.").

[27] Coal. for a Sustainable 520, 881 F. Supp. 2d at 1261-62.

issue, the trial court correctly decided that SEPA did not apply to WSDOT's PUN motion.

*C. The Trial Court Did Not Abuse Its Discretion by Making Select Evidentiary Rulings Related to the Environmental Impacts of the Project*

MCC also challenges the trial court's decision to exclude nontransit-related evidence of the condemnation's environmental impacts and testimony from Cieri about whether the Reevaluation was subject to independent review. We review evidentiary challenges for an abuse of discretion.[28] "A trial court's decision on excluding evidence will be reversed only where it was based on untenable grounds or reasons."[29]

First, MCC asserts that the trial court should have allowed evidence of nontransit-related impacts because this evidence was relevant to whether WSDOT acted arbitrarily and capriciously. Because the portion of the record that MCC cites does not show that it offered this evidence, we decline to review this claim.

Second, MCC claims that whether a person or entity independent of WSDOT had reviewed the Reevaluation was relevant to whether WSDOT's decision to condemn the Properties was arbitrary and capricious because it inadequately assessed environmental impacts. But a court could reasonably

---

[28] Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 766, 389 P.3d 517 (2017).
[29] Taylor, 187 Wn.2d at 766.

view this information as irrelevant because the sufficiency of the Reevaluation was not at issue. We thus reject MCC's evidentiary challenges.

<u>WSDOT Established That Condemnation of the Properties Was Necessary</u>

Montlake asserts that substantial evidence does not support the trial court's findings that condemnation of the Properties is necessary for construction of the Montlake Phase and that WSDOT's necessity determination is not arbitrary and capricious to the point of constructive fraud. We disagree.

As another preliminary matter, Montlake did not support its assignments of error to findings 1.18 through 1.21 with legal argument in its opening brief and thus waived these claims. "An appellate court will not consider a claim of error that a party fails to support with legal argument in [its] opening brief."[30] Findings of fact 1.18 through 1.21 state that WSDOT introduced evidence establishing that it needed to condemn the Properties to construct a shared-use bicycle and pedestrian path for the public, to integrate highway grade changes into the surrounding streets and adjacent properties, and to provide necessary right-of-way for the design-builder to shift traffic during construction of the new Montlake Boulevard, its approach to the Interchange/SR 520 Bridge, and the new 54-inch waterline to the east of Montlake Boulevard. Because Montlake does not provide

---

[30] <u>Jackson v. Quality Loan Serv. Corp.</u>, 186 Wn. App. 838, 845, 347 P.3d 487 (2015) (citing <u>Mellon v. Reg'l Tr. Servs. Corp.</u>, 182 Wn. App. 476, 486, 334 P.3d 1120 (2014)); RAP 10.3(a)(6).

legal argument in its opening brief to support its challenges to these findings, it has waived these claims.

A. *Substantial Evidence Supports That Condemning the Properties Is Necessary To Complete the Montlake Phase*

Montlake challenges the sufficiency of the evidence supporting the trial court's finding that WSDOT established its need to condemn the Properties by showing condemnation would reduce the financial risk associated with potential relocation of the King County combined sewer line. Montlake claims that because Cieri testified that relocation of the sewer is "highly unlikely," taking the Properties to accommodate the sewer relocation is not reasonably necessary for use in a reasonable period of time and is thus unnecessary. Montlake, however, does not address WSDOT's need for the Properties to reduce the project's financial risk in the event that WSDOT does not need to relocate the sewer or the numerous reasonably necessary uses for the Properties Cieri described in her testimony.

Consistent with the State's argument, regardless of whether WSDOT determines that it must actually replace the sewer line, it must acquire the Properties to construct the Project designs and accommodate the surrounding community in a cost effective manner; Cieri testified that if WSDOT were unable to acquire the Properties there would not be "enough right-of-way to have a buildable project." First, if WSDOT needs to replace the sewer line located north

of the Properties, Cieri testified that it would need to dig a pit where the gas station is currently located and make an access drive on what is the Market's parking lot. Alternatively, if WSDOT does not replace the sewer pipe, it will use the "protect-in-place" method, which requires that WSDOT "build around it and do[es]n't harm it." As a result, the Properties would not be at grade with the surrounding SR 520 ramps and Montlake Boulevard, which means WSDOT would need to raise the Properties to the new grade.

Further, Cieri described the need to condemn the Properties to improve nonmotorized transportation routes and provide pedestrians and bicyclists a more direct route from the Properties to the Portage Bay area. She stated that through the Seattle design process WSDOT learned that the nonmotorized community prioritizes accessibility and "those attractive routes." In addition, Cieri explained that when WSDOT reconstructs the portion of Montlake Boulevard next to the Properties, it would need to shift traffic onto the Properties to provide sufficient workspace for the contractor and accommodate the large volume of traffic. She stated that construction of the new City waterline located east of the Properties would also necessitate the shifting of traffic onto the Properties.

In addition to providing a more direct route for the nonmotorized community and shifting traffic, Cieri explained that WSDOT needs to use the Properties as a staging area. She explained that Montlake is a historic

-16-

neighborhood and a heavily built-up area where very little empty land remains. She characterized the Properties as valuable for staging because they are flat, have access to highway on- and off-ramps and the streets on all sides, and easily allow trucks to move in and out. Even if WSDOT obtained the Montlake Properties for staging, Cieri testified that she could not guarantee that she would not need more property for staging. Cieri's testimony supports the trial court's findings that condemning the Properties is necessary to allow WSDOT to complete the Project.

*B. Substantial Evidence Supports That WSDOT's Necessity Determination Was Not Arbitrary and Capricious Amounting to Constructive Fraud*

Montlake also challenges the sufficiency of the evidence supporting the trial court's findings that WSDOT's condemnation decision was not arbitrary and capricious amounting to constructive fraud. Montlake contends that WSDOT's condemnation decision constitutes constructive fraud for three reasons: WSDOT allegedly improperly used the larger parcel analysis in selecting the Properties for condemnation, it allegedly did not follow its Right of Way Manual ("Manual"), and it changed its position about its need for the Properties for staging.

1. Larger Parcel Analysis

First, Montlake claims that the trial court erred in holding that WSDOT's use of "larger parcel" analysis to select the Properties for condemnation was not proof of arbitrary and capricious conduct. Montlake asserts that "larger parcel"

-17-

analysis is a just compensation concept that WSDOT cannot use to avoid establishing an individual need for each of the three parcels that comprise the Properties. Montlake also claims that WSDOT's larger parcel analysis is legally and factually flawed because the Properties do not constitute a "larger parcel."[31] "Larger parcel" analysis is, in fact, used to determine just compensation.[32] But Montlake does not cite legal authority to support its proposition that an agency cannot consider the cost of the property when making a condemnation determination. In fact, a condemning authority should consider the cost of condemnation in a project funded by taxpayer dollars.

In HTK Management, LLC v. Seattle Popular Monorail Authority,[33] our Supreme Court explained that an agency may consider the cost of a temporary versus a permanent acquisition when making the decision to condemn: "It is significant [when] cost of the temporary construction easement combined with likely cost of damages due to a ground lessee could eclipse the cost of a fee interest." Because larger parcel analysis informs an agency's evaluation of the cost of the properties at issue, a court could reasonably interpret its application as relevant to an agency's condemnation decision as the trial court did here.

---

[31] State v. McDonald, 98 Wn.2d 521, 526-27, 656 P.2d 1043 (1983) (requiring unity of ownership, unity of use, and contiguity to establish a single tract for purposes of compensation).
[32] McDonald, 98 Wn.2d at 526-27.
[33] 155 Wn. 2d 612, 638, 121 P.3d 1166 (2005).

### 2. Right of Way Manual

Next, Montlake asserts that WSDOT's alleged failure to follow its Manual amounted to constructive fraud. But consistent with the State's argument, Montlake mistakes the Manual's discretionary guidelines for mandatory procedures. As discussed above, because WSDOT did not formulate its internal policies in response to legislative delegation, these policies do not have the force of law.[34] WSDOT's alleged failure to follow its Manual does not prove that its condemnation decision was arbitrary and capricious.

### 3. Iterative Design Changes

Last, Montlake claims that WSDOT's condemnation decision was arbitrary and capricious because WSDOT changed its position about its need to use the Properties for staging. During a public presentation in December 2016, WSDOT stated that it would not need the Properties for staging. Later, it justified selecting the Properties for condemnation, in part, by claiming that it did need the Properties for staging. The trial court found, however, that "[i]terations of project design are not evidence of arbitrary or capricious conduct amounting to constructive fraud." Because Montlake does not challenge this finding, it is true on appeal.[35] In addition, Cieri testified that during the initial stages of the design process when the ROD is developed, designs are only "half a percent to maybe

---

[34] Joyce, 155 Wn.2d at 323.
[35] Nguyen, 179 Wn. App. at 163.

up to five percent" complete. Cieri stated that when she gives a project like the SR 520 Project to the design-builder, the design is typically only fifteen to thirty percent complete. Because design changes are an expected part of the process, a trial court could reasonably conclude that WSDOT's changed staging needs did not show that its condemnation decision was arbitrary and capricious.

<u>The Mega-Project Requirements Do Not Prevent WSDOT from Condemning the Properties</u>

Montlake asserts that the trial court's order failed to enforce the legislature's "Mega-Project"-specific requirements under RCW 47.01.380, RCW 47.01.390, and former RCW 47.01.405. But because chapter 47.01 RCW does not provide a private cause of action, we reject this claim. To determine whether to imply a cause of action, a court must address the following issues: "first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation."[36] To determine the legislative purpose of multiple statutes, a court should construe together statutes that relate to the same subject matter.[37]

RCW 47.01.380, RCW 72.01.390, and former RCW 47.01.405 direct WSDOT to mitigate the impacts of the Project and comply with NEPA. The

---

[36] <u>Bennett v. Hardy</u>, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990).
[37] <u>Beach v. Bd. of Adjustment</u>, 73 Wn.2d 343, 346, 438 P.2d 617 (1968).

statutes require WSDOT to report to the joint transportation committee and to the governor.[38] So WSDOT has a duty to the legislature and to the governor. But because these statutes do not explicitly or implicitly communicate that the legislature intended individuals to have a right to enforce WSDOT's compliance with the statutory requirements, chapter 47.01 RCW does not provide Montlake with a private right of enforcement. We thus decline to review the merits of Montlake's assignment of error to the trial court's conclusion that WSDOT complied with all relevant statutory mandates.

### Secretary Millar Did Not Improperly Redelegate His Condemnation Power to Program Administrator Meredith

Montlake asserts that the legislature gave only the secretary of transportation eminent domain power, and Secretary Roger Millar acted outside the scope of WSDOT's statutory condemnation authority when he allowed Mega-Project Program Administrator Julie Meredith to decide to condemn the Properties. We disagree.

Neither party challenges the trial court's finding that Meredith made the final decision to seek condemnation of the Properties. So we accept this finding as true on appeal. Montlake cites State v. King County[39] to support its claim that

---

[38] RCW 47.01.390; former RCW 47.01.405.

[39] 74 Wn.2d 673, 676, 446 P.2d 193 (1968) (holding that the state board did not impermissibly delegate its eminent domain power but, instead, properly delegated to the local board the day-to-day ministerial control of the community college district subject to its supervision).

-21-

the redelegation of eminent domain powers is generally invalid. But the issue in King County was whether the Washington State Board for Community College Education had improperly delegated its condemnation power to a local board of trustees of a community college without legislative authorization.[40] Here, the legislature explicitly authorizes the secretary to delegate his powers as he deems necessary. Although RCW 47.12.010 delegates to the secretary the power to select properties for condemnation,[41] RCW 47.01.101(3) gives the secretary the authority to "delegate any powers, duties, and functions to . . . any officer or employee of the department as deemed necessary to administer the department efficiently."

A 2015 executive order issued by the previous secretary delegated to the "Mega-Project Administrators" the "authority to approve any and all contracts and documents pertaining to [her] organizations' assigned program areas." Secretary Millar stated that he met with Meredith on a biweekly basis to discuss the Project and "concurred in [Meredith's] assessment of the need for the [Montlake] property and also . . . determined the State should acquire the entire parcel." Millar acted within the scope of the plain language of RCW 47.01.101(3) by delegating to Meredith the power to make decisions, including condemnation

---

[40] King County, 74 Wn.2d at 674-75, 677.
[41] "[I]n such action the selection of the lands or interests in land by the secretary of transportation shall, in the absence of bad faith, arbitrary, capricious, or fraudulent action, be conclusive."

-22-

decisions, related to the Project. Thus, Montlake has not shown that Millar improperly redelegated his eminent domain power.

Montlake also asserts that this court should not grant "legislative deference" to Meredith's condemnation decision. Montlake does not define "legislative deference" and cites as its only supporting authority In re Petition of Puget Sound Power & Light Co.,[42] which does not substantiate its claim. When a party does not support its assertions with authority, a reviewing court assumes that it has found none.[43] We decline to consider this issue.

## ATTORNEY FEES

Montlake requests attorney and expert witness fees under RCW 8.25.070. RCW 8.25.070 requires that a court award reasonable attorney and expert witness fees in select circumstances involving a just compensation determination or stipulation by the condemnee to an order of immediate possession by the condemnor. Because this case concerns neither of these circumstances, we decline to award Montlake attorney or expert witness fees.

## CONCLUSION

Substantial evidence supports WSDOT's necessity determination and that its condemnation decision was not arbitrary and capricious amounting to

---

[42] 28 Wn. App. 615, 619, 625 P.2d 723 (1981) (explaining that a governmental body exercising its power of eminent domain must make its decision in a public forum where affected citizens have an opportunity to object).
[43] State v. Lord, 117 Wn.2d 829, 853, 822 P.2d 177 (1991).

constructive fraud. Montlake did not show that Secretary Millar improperly redelegated his condemnation authority to Program Administrator Meredith. We affirm.

WE CONCUR:

_Leach, J_

_Spearman, J._

_Appelwick, J_